# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2117 | **DATE** | 12/17/2004 |
| **CASE TITLE** | Terry Bell vs. City of Chicago, Fred Woods, and Donald Bester | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant City of Chicago's Motion for Summary Judgment

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the memorandum opinion and order attached hereto, Defendant City of Chicago's Motion for Summary Judgment [Doc. No. 25] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | 12/20/04 date docketed | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | date mailed notice | | |
| mvf(lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

DEC 2 0 2004

TERRY BELL,                          )
                                     )
                                     )
              Plaintiff,             )
                                     )   No. 03 C 2117
       v.                            )
                                     )   HONORABLE DAVID H. COAR
CITY OF CHICAGO, FRED WOODS, and     )
DONALD BESTER,                       )
                                     )
                                     )
              Defendants.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Terry Bell has filed a six-count second amended complaint against defendants

City of Chicago ("the City"), Fred Woods, and Donald Bester.[1] In it, she alleges four claims

against the City for hostile work environment, sexual harassment,[2] sex discrimination, and

retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et seq.* She also alleges two claims against Woods and Bester for violation of 42 U.S.C. §

1983 and slander *per se.*[3] The City's motion for summary judgment pursuant to Fed. R. Civ. P.

---

[1] The parties agree that the individual identified as "Donald Becker" in the second amended complaint is actually named "Donald Bester." Thus, the court on its own motion has amended the caption to correct plaintiff's initial error in this regard.

[2] Plaintiff's complaint treats hostile work environment and sexual harassment as separate causes of action.

[3] According to the City's representations in its briefing on the instant motion, Woods and Bester had not yet been served with the complaint and are not represented by the City's counsel herein. Woods subsequently has been served and has filed a motion to dismiss, which is pending before this court. Plaintiff has been directed to serve Defendant Bester on or before December 22, 2004, or all claims against him will be dismissed.



59 is now before this court. For the reasons set forth below, the motion is granted in part and denied in part.

## I.    Summary Judgment Standard

At summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See, e.g., Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875 (7th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Schuster, 327 F.3d at 573 (quoting Wade v. Lerner New York, Inc., 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 923, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. Michael v. St. Joseph County, et al., 259 F.3d 842, 845 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. Celotex, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to

defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## II.    Facts[4]

### A.    Background Concerning Plaintiff's Employment with the City

The City is a municipal corporation incorporated under the laws of the State of Illinois. On or about September 16, 1996, the City hired plaintiff as a "Public Health Nurse I." She was assigned to work at a clinic located at 10 South Kedzie ("the Kedzie clinic").

In January 1997, the City promoted plaintiff to "Public Health Nurse II." During the summer of 1997, problems arose between some of the staff at the Kedzie clinic and plaintiff. These problems culminated with someone pouring hot sauce on some items on plaintiff's desk – specifically, her paperwork and personal pictures – and someone sending dog feces to plaintiff through the mail. Mary Witherspoon was the supervisor at the Kedzie clinic at that time.

In the summer of 1997, Plaintiff transferred to the Englewood clinic. There, plaintiff had problems with her supervisor, a Ms. Williams. Williams tried to write up plaintiff at every chance she had in order to punish plaintiff for causing problems at the Kedzie clinic for

---

[4] In support of its motion for summary judgment, the City submitted a 130-paragraph Local Rule 56.1 statement of facts, to which plaintiff did not respond. Accordingly, all of the facts are deemed admitted, although they do not provide a coherent or even cohesive picture of the events leading up to this lawsuit. *See* L.R. 56.1(b)(3)(B). Plaintiff submitted a Local Rule 56.1(b)(3)(B) statement of additional facts, to which the City responded. In addition to being internally contradictory, both parties' statements of undisputed fact conflict in part with the deposition transcripts and affidavits provided and with the EEOC charge forms. The date or time when events occurred is notably uncertain in all filings. Whenever possible, an attempt has been made to use the most contemporaneous or objective source for purposes of establishing date of disputed events. For example, Plaintiff's sexual harassment charge with the City Sexual Harassment Office has been used to determine the date of the altercation between Woods and Plaintiff in early 2002.

Witherspoon, who was Williams' friend. Plaintiff did not receive any discipline related to those write-ups. Plaintiff also had problems with a Ms. Jones, an older nurse at the Englewood clinic. At some point, Jones put her finger or fist in plaintiff's face and talked about how she could knock plaintiff's head off. Plaintiff accused Jones of assault and filed a police report against her, but subsequently did not press charges because fellow co-workers told plaintiff that she could not do that "to an old lady."

In the summer of 1998, plaintiff was involved in a car accident during work hours. She was subsequently off work for four months. While Plaintiff was on disability leave, she was denied a salary increase. According to the City's personnel record for Plaintiff, she returned to active status on September 21, 1998. On December 16, 1998, she was denied a second salary change. In March 1999, Plaintiff did receive a salary increase. From March 1999 until her final leave of absence, Plaintiff's personnel record shows no other denials of salary increase. Upon her return in September, she was assigned to a Public Health Nurse I position at the Roselyn clinic for one and a half months – until she could ascend and descend stairs without difficulty.

Plaintiff requested a transfer from the Roselyn facility so that she could return to working as a field nurse in the position of "Public Health Nurse II." Thereafter, in approximately late 1998 or early 1999, she was transferred to the Uptown clinic. Plaintiff remained at the Uptown clinic until she went out on her final medical leave of absence in May 2002. Plaintiff did not renew her medical leave of absence in October 2003, and she is no longer employed by the City of Chicago.

### B. Plaintiff's Tenure at the Uptown Clinic

In January or February 1999, plaintiff moved to the Uptown Clinic, where she began

working with the tuberculosis team. Osagie Igbinosun (male) was the Nursing Supervisor at that site. In this capacity, Igbinosun supervised Plaintiff during her time at the Uptown clinic. Fred Woods and Donald Bester worked at the Uptown Clinic in 1999 as Communicable Disease Control Investigators.

### 1.    Her Complaints Regarding Woods

Plaintiff contends that Woods subjected her to repeated outrageous and highly offensive conduct -- namely, sexual comments and advances and sexually hostile and abusive language and actions -- at work from January 1999 through May 2002.

Upon her arrival at the Uptown clinic in January 1999, Plaintiff was assigned to go to the field with Communicable Disease Control Investigator Fred Woods to train for her tuberculosis team position. As they were leaving the clinic, Woods asked plaintiff what had happened between Witherspoon and herself at the Kedzie clinic. Plaintiff declined to answer, stating she did not like to discuss personal issues with someone she had just met. Woods then said, "Fuck you, bitch, then. I ain't taking you no where." During the same conversation, Woods asked plaintiff out to lunch with him. Plaintiff refused, stating that she does not mix business with pleasure. Plaintiff complained to Igbinosun that Woods refused to take her out for training. Plaintiff states that Igbinosun told her to just read the training manual at her desk instead.

At some point between the summer and fall of 1999, Fred Woods and Donald Bester began to refer to Plaintiff as "dykes"; Fred Woods called Plaintiff "dyke-ass bitches." Plaintiff states that Donald Bester also told Plaintiff that he and Woods were real "ladysmen" (*sic*) and asked Plaintiff to give him a chance. According to Plaintiff, Bester agreed with the things Woods said about and to Plaintiff, but did not call Plaintiff any names to her face. In or around May

1999, Plaintiff reported to her supervisor, Osagie Igbinosun, that Fred Woods was calling her "dykes," "bitches," "nappy-headed bitch," and telling her that she "ain't got a pot to piss in or a window to throw it out." Plaintiff also reported the name-calling to Karen Kennedy-Cook and Michelle Bowen, who were Illinois Nurses' Association representatives. Bowen and Kennedy-Cook told Plaintiff simply to curse Woods out one good time and that he would then leave her alone. Plaintiff did not do so.

Plaintiff contends and the City admits that Woods talked repeatedly about how large the breasts of several co-workers were. Plaintiff also alleges that Woods told one co-worker to jump off the roof of the clinic building and "just land butt-naked on his face." None of the other co-workers complained to Plaintiff that Woods was sexually harassing them. To her knowledge, none of her co-workers filed any sexual harassment complaints against Woods.

On or about March 22, 2000,[5] when Woods, Plaintiff, co-worker Priscilla Edwards, and a new employee were present in the field room, Woods called Plaintiff a "stupid bitch" and a "brainless whore," and told the new employee that there were no brains under Plaintiff's hat. Plaintiff told Woods not to call her names. Woods became angry, slammed the door of the field room, and approached plaintiff. Priscilla Edwards stood between Woods and Plaintiff and told Woods, "Don't do it." Plaintiff reported the incident to Igbinosun.

In late 2001, Plaintiff reported that Woods was following her in his car while she was visiting patients in the field. Plaintiff also found the headlights of her car painted black at around

---

[5]This incident may or may not be the same as the first of the three incidents described as occurring in 2001 and 2002 where Woods tried to "jump on" Plaintiff. From the evidence, it is not possible to determine whether these are two separate occurrences or whether Plaintiff was confused in her deposition testimony. Because this Court views the evidence in the light most favorable to the Plaintiff, however, it will treat these as two separate incidents for the purpose of this motion.

this time. Plaintiff believed it was Woods who vandalized her car, but she did not see him do so. She did not see him at all on the days her car was vandalized.

During 2001 and 2002, Plaintiff estimates that she complained to Igbinosun at least twice a week that Woods was playing his radio too loud in the field room at the Uptown clinic. The field room housed the entire tuberculosis team, approximately eight or nine people, who worked at desks ranged along the walls and shared phones. Igbinosun directed Woods to turn down his music several times. In response, Woods said, "I can't do nothing with that crazy-ass bitch around."

In late 2001 or 2002,[6] Plaintiff reported to Osagie Igbinosun that Fred Woods was stating that she was "fucking a TB patient." Woods began saying this after seeing Plaintiff interacting with one of the clinic's tuberculosis patients, who was an acquaintance of Plaintiff's son. Woods repeated this statement to other people at the clinic. Shortly after Woods made this statement, one of Plaintiff's other patients came to the clinic to see her. Upon observing Plaintiff with the patient, Woods said, "Oh, hell no. This bitch is fucking another patient." Plaintiff reported this incident to Igbinosun as well. Plaintiff does not know if Igbinosun did anything about her complaint. In addition, Plaintiff informed Igbinosun that Woods had called her, on more than five occasions, "whores and bitches," and "sluts." Plaintiff also reported this name-calling to Tasneem Shakir, the Department of Health's Employee Relations Supervisor.

Plaintiff testified in her deposition that she made multiple requests to the Department of

---

[6]Plaintiff also describes this event as occurring in 2000. Because the substance of the events described is the same, including patient names, this Court will treat this as one event. From the testimony, it is not clear whether it occurred in 2000 or in 2001 or in 2002. Therefore, in accordance with the summary judgment standard, this Court will view the event as occurring at the time most favorable to the Plaintiff. For the purposes of this motion, it does not matter when this event occurred.

Health for a transfer to another division or department. She stated that she had one interview opportunity, but was unable to take time off work to attend it. She could not recall the position title or description. In addition, she asserted that she asked Igbinosun if she could transfer to the APORS program for high-risk pregnancy patients but that he denied her request because he did not think she could handle the workload.

Between 2001 and May 2002, Woods tried to "jump on" Plaintiff three times. At some point in 2001, Plaintiff was talking on the telephone in the field office at the Uptown Clinic. Woods was in the office at the same time and called Plaintiff a "nappy-headed bitch." Plaintiff told Woods not to call her names, whereupon he moved very close to Plaintiff. A co-worker, Priscilla Edwards, stepped between Woods and Plaintiff and told Woods, "Don't do that." Edwards stated that she heard Woods call Plaintiff a "mother fucking bitch" more than five but fewer than ten times. Plaintiff reported this incident to Igbinosun, who said he would talk to Woods. The second altercation occurred later in 2001 when Woods walked into the field room and found Plaintiff and Edwards there. Woods said to Plaintiff, "If you've got something to say about me, bitch, say it to my face." Priscilla Edwards was again present and told Woods that they were not talking about him. Edwards recalls only one altercation where she had to step between Plaintiff and Woods. Plaintiff reported this second incident to Igbinosun, but cannot remember when. Plaintiff also reported this incident and the fact that Woods called her a "whore" to Tasneem Shakir, the Department of Health's Employee Relations supervisor. Plaintiff said Shakir told her that as long as Woods did not "hit her on the head with a chair or a bat and make

her bleed, that he had freedom of speech." (Defs.' Facts at ¶ 43.)[7]

The third incident also occurred in the field room, when Woods, Plaintiff, and another nurse, Carmelita Balmadrid, were all present. According to Plaintiff, Woods was talking about beating Plaintiff up. Carmelita Balmadrid recalls only that Woods and Plaintiff were arguing, but does not recall any time that Woods yelled at Plaintiff, used sexual language, touched Plaintiff, or called Plaintiff any names.

In early January 2002,[8] Plaintiff was in the field room, using the telephone to inquire about when she would receive her next pay increase. Woods told her to "shut the fuck up." Plaintiff continued to talk on the phone. Woods then got up, closed the door to the field room and "rushed" towards Plaintiff. Plaintiff put the phone down, without hanging up, and quickly went and reopened the door. As she walked back to her seat, Woods "took his shoulder and rammed" Plaintiff into the wall. Plaintiff called the police and then reported the incident to Igbinosun. The

_____

[7] In an example of the perplexing brief-writing by both sides in this case, the City objects to Plaintiff's restatement of a fact that the City originally included in its own statement of undisputed fact. This is not only puzzling but renders this Court's task more complicated and time-consuming. At times, the City raises a valid evidentiary objection to Plaintiff's facts, but apparently overlooks the not insignificant detail that the fact in question was originally raised–and only subsequently restated by Plaintiff–in the *City's* own statement of facts. This Court commends the City's dedication to the rules of evidence but notes that it would be a better use of judicial resources and the parties' time if such zeal were applied to both the City's declarative and responsive pleadings. This Court also urges Plaintiff's counsel to re-examine Local Rule 56.1, most notably its requirement that the opposing party "shall serve and file any opposing affidavits and other materials referred to...." Plaintiff's carelessness in this regard is striking: a citation will include two pages from a deposition, but only one will be provided. This Court cannot base a decision on material it does not have before it.

[8] Defendants' Statement of Facts describes this incident as occurring in March 2002 and also as occurring in January 2002. The EEOC charge that Plaintiff filed on April 8, 2002 about the incident gives the date as February 8, 2002. However, Plaintiff's sexual harassment complaint to the City was dated January 14, 2002. This Court will treat the contemporaneously created document as more reliable evidence of the date on which this incident occurred. In light of the other evidence provided, this Court will treat this incident as occurring sometime in early January 2002. This Court notes that both parties, to their considerable detriment, treat time very casually in their brief-writing and fact statements.

police interviewed Woods, who denied hitting Plaintiff. The police told Plaintiff they would not allow her to press charges against Woods because Igbinosun and the Clinic Administrator, Mr. Eng, had informed them that the incident was a Chicago Department of Health issue which would be handled internally.

Plaintiff was given the number for the Employee Assistance Program shortly after this incident with Woods. Plaintiff described her work environment to the Employee Assistance Program counselor, who then told Plaintiff that she was being sexually harassed. The counselor called the City's Sexual Harassment Office on Plaintiff's behalf. Prior to her conversation with the counselor, Plaintiff did not really know that the City had such an office, although she had received a copy of the City's sexual harassment policy in January 1999.

After that incident, Plaintiff was moved out of the field room and into a room that she did not share. The room, which, like the field room, was in the basement of the Uptown clinic and had no windows, previously had been used to store medical records. The City denies it was a "closet," as plaintiff has characterized it, but admits its prior use was as a storage space.

In January 2002, Woods moved to the Auburn Gresham clinic on the south side of Chicago. Igbinosun told Plaintiff that Woods had requested a transfer. Woods returned to the Uptown clinic three or four times between January and May 2002, and stayed for approximately two hours on each visit. During his visits, plaintiff alleges, Woods would ask Plaintiff's co-worker, Pamela Crowder, to knock on Plaintiff's door and try to get Plaintiff to come out.

On March 15, 2002, Tasneem Shakir reported to the City's Inspector General's office that she had received allegations that Plaintiff was carrying a dangerous weapon in the workplace. Specifically, Shakir reported an allegation that Plaintiff was carrying a knife or a gun. On March

-10-

28, 2002, two investigators from the Inspector General's office went to the Uptown clinic,

obtained a Consent to Search form from Plaintiff, and searched her desk, coat, and personal

belongings, including her purse. They did not find any weapons or contraband. The investigators

did not find evidence to support the allegations that Plaintiff was carrying a dangerous weapon in

the workplace.

On May 24, 2002, Plaintiff states she was in her office in the basement of the Uptown

clinic when she heard someone she thought was Woods in an adjacent room, asking where the

"bitch" was. Plaintiff states she felt a panic attack coming on, and went to Weiss Hospital, where

her blood pressure was measured at 200 over 120. She stayed at the hospital for an hour or two.

After her hospital visit, she sought medical treatment at the Mercy Hospital mental health

counseling program. Plaintiff took a leave of absence for personal disability from her position at

the Uptown clinic as of May 27, 2002. She renewed her leave of absence at least once in

February 2003 and possibly again in late May 2003.

### 2.     City of Chicago Sexual Harassment Office Investigation

The City has a comprehensive sexual harassment policy. It defines prohibited conduct

and sets forth mechanisms for making complaints under the policy.

Plaintiff claims she complained repeatedly about Woods' harassment over her three-year

employment at the Uptown clinic. According to Plaintiff's testimony, she complained about

workplace incidents to a litany of City employees, including her supervisor, Igbinosun; Karen

Kennedy-Cook (INA Representative); Michelle Bowen (INA Representative); Joan Tucker (H.R.

Representative); Minnice Dennis (Director of TB Program); Ruth Slaughter (Director of

Nursing); Tasneem Shakir (Employee Relations supervisor); Latonya Cannon (District

-11-

Supervisor for the Lead program); Ms. Farra (H.R. Department); Mary McConnol (Field Staff Supervisor for Westtown Neighborhood Health Center). The City denies that and says she only complained to Shakir and Igbinosun about alleged workplace violence. The City further admits that she complained of sexual harassment by Woods to a Sexual Harassment Officer via telephone on January 14, 2002. Thereafter, the City's Sexual Harassment Office investigated Plaintiff's allegations and determined that their investigation did not sustain Plaintiff's complaint. However, the investigators concluded that training should be held for appropriate employees at the Uptown clinic. Neither party has specified what that training was.

### 3.    Her Complaints Regarding Other Co-Workers

Over the course of her employment with the City, Plaintiff experienced conflict with several co-workers. When Plaintiff first arrived at the Uptown clinic, the employees had a so-called Christmas fund. Each employee would contribute $100 every month, and at the end of the month, the entire fund would go to one employee. At the end of 2000, the fund was given to Yvonne Agyarquah, one of Plaintiff's co-workers. Plaintiff had not yet contributed her $100 for the month. Plaintiff states that Agyarquah choked Plaintiff and threatened to cut her neck with a razor if Plaintiff did not pay the $100. Plaintiff filed a Violence in the Workplace complaint against Agyarquah, which she signed on March 9, 2001. Plaintiff alleges that Igbinosun told her that she would be severely disciplined if she did not drop the Violence in the Workplace complaint. The City made the employees discontinue the "Christmas fund."

Plaintiff had a falling-out with a co-worker, Pamela Crowder, with whom Plaintiff initially had been friendly. Plaintiff and Crowder visited the field together when Plaintiff first arrived at Uptown. Plaintiff stopped taking Crowder to the field because she suspected Crowder

of telling Woods where Plaintiff was going, thereby enabling him to follow her or vandalize her car. Plaintiff and Crowder also had an altercation over the fact that Crowder told Plaintiff's boyfriend that Plaintiff had another boyfriend, which led to the breakup of both relationships. Plaintiff believed that Crowder was "stalking" Plaintiff by following Plaintiff around the clinic, making notes on Plaintiff's activities, and accusing Plaintiff of giving her mean looks or saying bad things about her.

Sometime in 2001, Plaintiff states that she and another public health nurse in the lead poisoning division at the Uptown clinic, Carmelita Balmadrid, were directed to switch some cases. Plaintiff contends that she discovered shortly thereafter that Balmadrid had been forging her case files by making notes on patient visits and consultations that never occurred. Plaintiff reported her allegations to Igbinosun and to LaTonya Cannon, district supervisor for the division of lead poisoning. Plaintiff does not know if Balmadrid was disciplined.

During the time Plaintiff worked with the tuberculosis team, she and co-worker Anthony Garcia had a verbal altercation. Plaintiff stated that she saw Garcia leaving tuberculosis medications on patient's doorknobs, instead of watching the patients take the medications. She reported this to Igbinosun who, she claims, told her to mind her own business and stop trying to find fault in others.

Plaintiff called the police to the Uptown clinic on one other occasion shortly prior to the January 2002 incident. Plaintiff alleges that Woods and Crowder asked Crowder's niece to come to the Uptown clinic and try to beat up Plaintiff, to get Plaintiff fired. According to Plaintiff, Crowder's niece came to the clinic and asked Plaintiff where Crowder was; when Plaintiff said she didn't know Crowder's whereabouts, Plaintiff contends the niece began pushing her and

-13-

"getting in [her] face, trying to get [her] to push ... back." (Bell Dep., p. 89, lines 7-20.) Plaintiff

called the police, but states they would not let her file a police report because she could not

provide a witness to the alleged assault. Plaintiff states that she filed a Violence in the Workplace

complaint with the City against Crowder; she contends Igbinosun then directed Crowder to file a

Violence in the Workplace complaint against Plaintiff.

### 4.    Her Disciplinary History

Plaintiff alleges that she was accused of theft by some of her co-workers. There were

more desks in the field room than there were telephones, so employees at adjoining desks shared

phones. Plaintiff did not have a telephone on her desk, but had to use the phones on her co-

workers' desks. Plaintiff alleges that she was accused of going into other employee's desks and

taking things when she used the telephones in the field room. Plaintiff contends that Igbinosun

told her that if it would cut down on the claims that she was stealing, she simply should not use

the phones in the field room. Plaintiff stated that instead she used phones elsewhere in the

building to schedule patient visits and make patient calls.

Plaintiff states that she was written up three times between the fall of 2001 and May 2002

because of disputes or altercations with Crowder. She cannot recall what the write-ups

specifically said, but thinks one was for antagonizing an employee. She was not disciplined for

any of the write-ups.

Plaintiff contends Igbinosun wrote her up sometime around March 2002 because she

laughed at Crowder for having "some funny make-up on."

In May 2002, Plaintiff states that Igbinosun told her she would be punished if she took

time off work to attend an EEOC interview related to her EEOC discrimination charge. She

-14-

testifies that she got a representative of the Illinois Nurses' Association to call Igbinosun and clarify her right to attend the meeting. The next day, Plaintiff contends, Igbinosun wrote her up, although she cannot recall the exact grounds.

Plaintiff testifies that on May 10, 2002, she was issued a written warning for "conduct unbecoming" a public employee after asking a patient whether the Sexual Harassment Office investigators had contacted him in relation to her sexual harassment complaint.

### 5. Her Medical Leaves and Separation from Her Employment with the City

Plaintiff was on a three month disability leave of absence from June to September 1998, after her car accident. Plaintiff first went on a personal disability leave of absence in October 1999 and returned to work in February 2000. Plaintiff took a second personal disability leave of absence from April 17, 2001 until May 6, 2001.

Plaintiff went on her final personal disability leave of absence on May 27, 2002, and she never returned to work at the City. According to City personnel records as of May 2003, she renewed her leave of absence in February 2003. She states she renewed her leave of absence again in June 2003. She did not renew her medical leave of absence in October 2003, and at some point thereafter, she was separated from her employment with the City.

### C. Plaintiff's Filing of EEOC Charges and Subsequent Filing of Her Complaint

Plaintiff filed her first charge of discrimination with the EEOC on April 8, 2002. In the charge, she describes the alleged assault by Woods, although the charge dates the incident as occurring on February 8, 2002. Plaintiff alleges sex discrimination and retaliation on her April 8 EEOC charge. The description of her charge, however, suggests that a more accurate reading is

that she was alleging sexual harassment. More specifically, she alleged that since 2001, she had constantly complained of a male employee's harassment through derogatory comments and physical threats. She further alleged that the employee physically attacked her on February 8, 2002. She claimed that she was subsequently moved into a small office and reprimanded, whereas her attacker was permitted to continue making derogatory comments and threats.

Plaintiff filed an amended EEOC charge on May 13, 2002, in which she alleged sex discrimination, retaliation, and sexual harassment. In the description of the events leading to the charge, Plaintiff detailed what she described as retaliation by her employer for her initial charge. Specifically, Plaintiff asserted that she was issued a written warning for "conduct unbecoming" a public employee for asking a patient if he had been contacted by Sexual Harassment Office investigators in relation to her claim. She also alleges that she was given a written warning for taking time off work to attend an EEOC interview in connection with her first EEOC charge, although such time off is required.

Plaintiff filed a second amended EEOC charge on July 11, 2002, also alleging sex discrimination, retaliation, and sexual harassment. The narrative attached to the second amended charge form is identical to the narrative included on the April 8, 2002 charge. The only difference is that the July 11 form includes a check in the box marked "Other–Sexual Harassment."

On August 22, 2002, the EEOC issued a determination letter based on its investigation of the amended and second amended charges of discrimination. In the determination letter, the EEOC stated that the evidence obtained in its investigation established reasonable cause to find that "the Respondent discriminated against the Charging Party ... in that she was harassed because of her sex," and that there was "reasonable cause to believe that the Respondent

-16-

retaliated against the Charging Party."

## III. Analysis

### A. Plaintiff's Sexual Harassment Claim

As a preliminary matter, this Court notes that Plaintiff alleges two separate counts based on sexual harassment. Her first count of her second amended complaint is for "sexual hostile work environment," while her second count is for "sexual harassment." In her amended and second amended complaint,[9] Plaintiff's sexual harassment count explicitly incorporates her allegations of hostile work environment sexual harassment and further alleges that "Defendants have intentionally harassed Plaintiff based upon her sex (female) in connection with Plaintiff's complaints of being sexually harassed by Mr. Woods....and through such harassment Defendants have caused and created a longterm (*sic*) sexually hostile work environment." (Pls. Am. Compl. ¶30.) Thus, it is evident that the two counts arise from the same underlying conduct. Because hostile work environment is a form of sexual harassment under Title VII law and because the two counts are based on the same facts and conduct, this Court will treat them as one and the same.

### 1. Timeliness of Plaintiff's Allegations

Before the merits of Bell's claims can be addressed, the Court must determine whether any of her allegations are time-barred. Under Title VII of the Civil Rights Act of 1964, a plaintiff must file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") or the Illinois Human Rights Commission within 300 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v.

---

[9] This Court notes that it was difficult to determine how Plaintiff defended or supported her allegations due to the poor writing in Plaintiff's summary judgment filings.

Morgan, 536 U.S. 101, 109 (2002) (discussing charge filing requirements of Title VII). When the act complained of is a discrete retaliatory or discriminatory act, "it 'occurred' on the day it 'happened'." Morgan, 536 U.S. at 110. The 300 day period begins to run on the day the act occurred.

Hostile work environment claims differ from claims of discrete discriminatory acts, because the "unlawful employment practice" occurs over a period of several days, months, or even years. A single act of harassment may not be actionable; it is rather the cumulative effect of individual acts that provides the basis of the claim. Morgan, 536 U.S. at 115. For the purposes of the Title VII claim filing requirement, if at least one "act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court of the purposes of determining liability." Id. at 117. Acts that occurred outside the limitations period, e.g., that occurred more than 300 days prior to the triggering act, must be connected to the events that occurred within the limitations period. Id. at 118. A significant time lapse between the acts within the limitations period and those outside it may bar Plaintiff from seeking recovery for or relying on the acts that occurred outside the statutory period. See Garrison v. Burke, 165 F.3d 565, 570 (7th Cir. 1999) (quoted in Boebel v. Combined Ins. Co. of Am., No. 02 C 1772, 2004 WL 144135, at *3 (N.D. Ill. Jan. 16, 2004)).

There are three considerations a court may use to determine whether a continuing violation exists: (1) the relatedness of the subject matter of the alleged acts or conduct; (2) the frequency of the acts or conduct complained of; and (3) their degree of permanence. See Selan v. Kiley, 969 F.2d 560, 565 (7th Cir. 1992). Here, the City alleges that any of Plaintiff's claims arising from events that occurred prior to June 13, 2001, must be time-barred. Plaintiff filed her

-18-

EEOC charge on April 8, 2002, alleging that "[s]ince 2001, I have constantly complained to the Respondent of a male employee harassing me, making derogatory comments, and physically threatening me." The City correctly states that Plaintiff must link acts occurring before June 13, 2001 with acts that occurred within the 300 day limitations period. This Court finds, however, that plaintiff has presented sufficient evidence to establish a continuing violation. The verbal abuse of which Plaintiff complains occurred throughout her employment at the Uptown clinic. Plaintiff also presents evidence that the verbal abuse was frequent. Moreover, the abusive conduct was repetitive both in subject matter and occurrence. An individual instance of Woods' name-calling might not have been sufficient to support a sexual harassment claim under Title VII; however, a history of ongoing and repetitive verbal abuse and physically threatening behavior over the course of three years is sufficient to find a continuing violation.

### 2. Analysis of Bell's Sexual Harassment Claim

In the complaint, plaintiff asserts two purportedly distinct claims – one for "sexual harassment" (Count I) and one for "hostile work environment" (Count II). There is no apparent difference between the two claims, as they are based upon the same set of alleged facts and the same theory of sexual harassment (*i.e.*, hostile work environment). More specifically, she alleges that Woods sexually harassed her and that the City failed to act appropriately and timely in response to his conduct and that she thus was made to endure a sexually hostile work environment that unreasonably interfered with the terms and conditions of her employment. Accordingly, this court will analyze the single sexual harassment claim alleged by plaintiff.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." <u>Meritor Sav. Bank, FSB v. Vinson</u>,

477 U.S. 57, 67 (1986). To prevail on a hostile work environment claim, a plaintiff must

establish that: (1) she was subjected to unwelcome sexual advances, request for sexual favors or

other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive

enough to create a hostile work environment; (3) the conduct was directed at her because of her

sex; and (4) there is a basis for employer liability. Hall v. Bodine Elec. Co., 276 F.3d 345, 355

(7th Cir. 2002); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

For sexual harassment to be actionable, it must be "so severe or pervasive as to alter the

conditions of [the victim's] employment and creative an abusive working environment."

Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor, 477 U.S. at 67).

Moreover, to support a hostile work environment claim, the work environment must be offensive

both objectively and subjectively, i.e., "one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787. In

ascertaining whether a hostile work environment exists, a court must look to the totality of

circumstances, including factors such as "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." Russell v. Bd. of Trs.

of Univ. of Ill., 243 F.3d 336, 343 (7th Cir. 2001) (internal quotations and citation omitted).

Here, although its argument is not concise or clear, the City essentially contends that

plaintiff cannot establish any of the requisite elements of her sexual harassment claim.[10] This

court disagrees and finds that there exists a genuine issue of material fact concerning plaintiff's

---

[10] The City's summary judgment brief is also characterized by sloppy writing and incomplete, cursory analysis of legal issues.

ability to do so.

First, as to whether Plaintiff was subjected to unwelcome sexual advances or other physical or verbal conduct of a sexual nature, Plaintiff has alleged several instances of such conduct. She contends that Donald Bester told her to give Fred Woods "a chance" and urged her to go out with Woods. She recounted at least one incident where Fred Woods accused her of "fucking a TB patient" in front of other patients and employees. Plaintiff heard Woods direct another employee to go up to the clinic building roof, jump off, and "just land butt-naked on his face." Woods repeatedly called plaintiff names, including "whores," "sluts," "stupid bitch," "brainless whore," "dykes," and "lesbian." Plaintiff testifies that she stopped counting the number of times Woods called her "whore" after the fifth occurrence. Moreover, Woods asked Plaintiff out to lunch with him on the day he was to take her to do field work training. When she declined, stating that she does not mix business with pleasure, he said, "Fuck you, then, bitch. I ain't taking you no where." Woods refused to take her to the field. This Court finds that Plaintiff has presented sufficient evidence to meet the first requirement of her prima facie case.

As for whether the conduct was sufficiently severe or pervasive, the Seventh Circuit has held that "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002); see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) ("[T]he occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create an objectively hostile work environment.). However, "[a] limited number of incidents . . . does not preclude necessarily a trial on a sexual harassment claim." Hilt-Dyson, 282 F.3d at 463; see, e.g., Smith v. Sheahan, 189 F.3d 529, 532 (7th Cir. 1999) (finding genuine

issue of material fact in sexual harassment claim based on physical assault and history of verbally abusing female co-workers). In those cases, the severity of the isolated conduct was sufficient "to create potentially a hostile work environment for the employee." Hilt-Dyson, 282 F.3d at 463. Here, Plaintiff alleges a history of repeated verbal abuse accompanied by at least one physical confrontation. It is clear that Plaintiff found her work environment subjectively hostile; she complained frequently about Woods' conduct to Igbinosun and to Tasneem Shakir. The City claims that Plaintiff "cannot demonstrate that the conditions of her employment were altered by this conduct," but ignores the fact that Plaintiff was moved to another office and ultimately took a medical leave of absence because of the conduct. The parties' remarkably casual attitude towards time and sequence of events makes it impossible to determine with any degree of certainty how often the conduct occurred. Because this Court will draw all reasonable inferences in favor of the non-moving party, as it must under the summary judgment standard, it finds that Plaintiff has alleged and offered evidence regarding more than just a series of "isolated events." Indeed, it would be reasonable to infer that the work environment at the Uptown clinic was a toxic mix of hostility and abuse on a regular basis. Therefore, this Court finds that Plaintiff has established both an objectively and subjectively hostile work environment.

Plaintiff must also demonstrate that the conduct in question was directed at her because of her sex. The City, however, attempts to argue that Plaintiff has not demonstrated that Woods' conduct towards her was based on gender bias or because of her sex. Instead, the City contends, the evidence only shows that he was angry at Plaintiff because she did not share details about work incidents at a previous work site. The epithets Woods used have an inescapably gendered character, such that it would be reasonable to infer that they were directed at her because she is a

woman.[11]

      Finally, Plaintiff must demonstrate that there is a basis for employer liability. It is unclear

from the evidence where Woods stood in relation to Plaintiff in the Department of Health's

hierarchy. The Seventh Circuit has held that an employer may be liable for the harassing conduct

of a supervisor. Hall v. Bodine, 276 F.3d 345 (7th Cir. 2002). However, under Hall, an employer

is only liable for a non-supervisor's conduct if the company was "negligent either in discovering

or remedying the harassment." Hall, 276 F.3d at 356. "'Notice or knowledge of the harassment is

a prerequisite for liability' in coemployee harassment cases." Id. (quoting Parkins v. Civil

Constructors of Ill., Inc., 163 F.3d 1027, 1035 (7th Cir. 1998)). If the employer has designated a

"point person" to accept complaints, then complainants normally can be expected to use that

person. If, however, such a point person either has not been designated or is not easily accessible,

then the complainant can go to someone that he or she *reasonably believes* is authorized to

receive a complaint of harassment. Parkins, 163 F.3d at 1035.

      In this case, the City's sexual harassment policy, which has been in effect since 1998,

states that "complaints of sexual harassment shall be made within one year of the sexual

harassment complained of and may be made to . . . : (1) a supervisor in the complainant's

department...." (City of Chicago Policy on Sexual Harassment, at III.B.) The policy then directs

the person who receives the complaint to refer it, "no later than the end of the third business day

---

[11] The City argues that words and phrases such as "whore," "brainless whore," and "mother-fucking bitch" do not necessarily constitute gender-based animus, but the case they cite for this assertion only addresses the use of the word "bitch." Galloway v. General Motor Serv. Part Operations, 78 F.3d 1164, 1168 (7th Cir. 1996). This Court finds the use of the word "whore," particularly the repeated and frequent use alleged in this case, to be strongly suggestive of gender-based animus. Moreover, the context in which these words and phrases were used frequently implied a sexual reference.

following receipt of the complaint," to the Sexual Harassment Office or designee. The policy further notes that "any supervisor who is aware of or reasonably should be aware of sexually harassing conduct by another employee, whether or not anyone complains about such harassment, but fails to report that conduct as required in this policy, may be subject to discipline." (Id. at II.C.) Plaintiff complained repeatedly about Woods' conduct to her supervisor, Osagie Igbinosun. She also complained to the Department of Health's Employee Relations supervisor, Tasneem Shakir. There is no evidence in this case to suggest that either one ever referred her complaint to the Sexual Harassment Office, as required under the City's policy. Based on the record in this case, it was not until Plaintiff contacted the Sexual Harassment Office herself in early 2002, after she realized that Woods' conduct was a form of sexual harassment, that any investigation occurred of any of Plaintiff's concerns. We are not concerned here with protecting an employer who had no notice of the harassing conduct and hostile environment created by one of its lower-level employees. The Department of Health had ample notice of the harassment occurring at the Uptown clinic. It chose to ignore it.

Plaintiff has established a prima facie case of hostile work environment sexual harassment; therefore, summary judgment for the defendant on her Counts I and II is denied.

**B.    Plaintiff's Sex Discrimination Claim**

Title VII prohibits employers from discriminating against individuals with respect to the conditions of their employment because of such individuals' sex. See 42 U.S.C. § 2000e-2(a)(1). In her amended and second amended complaint, Plaintiff's sex discrimination count explicitly incorporates her allegations of hostile work environment sexual harassment and further alleges that "Defendants have intentionally harassed Plaintiff based upon her sex, in the terms and

conditions of her employment and have subjected Plaintiff to disparate and material adverse actions, in connection with her complaints of being sexually harassed...." (Pls. Am. Compl. ¶30.). Thus, it is evident that this claim is predicated on almost precisely the same conduct that forms the basis for plaintiff's sexual harassment claim.

This is insufficient to create a separate count of sex discrimination. Her "sex discrimination claim" is not amenable to the required analysis because it is nothing more than her sexual harassment and retaliation claims dressed up in different clothing. Assuming *arguendo* that Plaintiff was alleging separate grounds for her sex discrimination count, it still fails because she cannot make a prima facie case.

Because plaintiff lacks direct evidence of sex discrimination, she seeks to prove her claim through the indirect method established by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973). See also Adams v. Wal-Mart Stores, Inc. 324 F.3d 935, 939 (7th Cir. 2003). Under this framework, a plaintiff first must make a prima facie case of discrimination by proving that: (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly-situated individuals outside of her protected class were treated more favorably. Bell v. EPA, 232 F.3d 546, 549 (7th Cir. 2000). If the plaintiff succeeds in doing so, then the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. Finally, the burden of persuasion remains with plaintiff to prove that the employer's proffered reason was pretext for unlawful discrimination. Essex v. United Parcel Service, 111 F.3d 1304, 1309 (7th Cir. 1997).

Plaintiff can establish that she is a member of a protected class. The question of whether she was performing her job satisfactorily is disputed. Plaintiff's supervisor wrote her up on

-25-

multiple occasions, according to Plaintiff's own deposition testimony, but it is unclear that she was ever formally disciplined for any of those write-ups. However, this Court does not need to delve further into the record to decide this point because Plaintiff's prima facie case fails on the next two elements.

### a.    Adverse Employment Action

To be materially adverse, an employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank and Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993). "For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted). Although an "adverse employment action need not be quantifiable in terms of pay or benefits[,] not everything that makes an employee unhappy is an actionable adverse action." Hilt-Dyson, 282 F.3d at 466 (internal quotations and citations omitted).

Plaintiff claims that she was denied salary increases; that she was written-up because of her harassment complaints; that she was not allowed to use the phone; that she was denied transfer requests; and that she was moved out of the field room and into a "closet" after the January 2002 incident with Woods.[12] None of these are sufficient to establish adverse

_____

[12] In Plaintiff's Memorandum in Opposition of (*sic*) Defendant's Motion for Summary Judgment, Plaintiff raises an additional alleged adverse employment action. She contends that the lack of response to her complaints of workplace harassment and violence caused her to have a nervous breakdown, which resulted in constructive discharge. Plaintiff cites no legal authority for this claim. This is a new claim, not included by the Second Amended Complaint (or first amended complaint, for that matter) or EEOC

employment actions.

First, Plaintiff's claims about the denial of salary increases are time-barred. Plaintiff was denied two salary increases in 1998, during and shortly after her leave of absence for injuries sustained in a car accident. Plaintiff did not file her EEOC charge, which did not include any reference to salary disputes, until April 8, 2002. Under Title VII, a plaintiff must file an EEOC charge within 300 days of the alleged adverse employment action; the 300-day period for Plaintiff's charge extended back to June 13, 2001, but no farther. Plaintiff's allegations about salary raises are time-barred because the raise denials occurred more than three-and-a-half *years* before she filed her EEOC charge.

Plaintiff next complains that she was given write-ups on several occasions because of her harassment complaints. The City argues that these allegations do not establish an adverse employment action because Plaintiff was never disciplined or suspended and never lost any pay. This is not a strong argument; the presence of write-ups in an employee's file itself may impact that employee's employment. However, Plaintiff failed to provide any evidence on the impact of these write-ups, and thus, this Court cannot determine whether they constitute an adverse employment action. Oest v. Ill. Dep't of Corr., 240 F.3d 605, 612-13 (7th Cir. 2001) (oral or written reprimands were insufficiently "'tangible job consequences' to constitute an independent basis of liability under Title VII").

Additionally, Plaintiff alleges she was prevented from using the telephone in the field room where her desk was located. The City argues that Plaintiff is barred from raising this claim

---

charges. Therefore, it is inappropriate and the Court will not consider it. See Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497 (7th Cir. 1994).

because it was not included in her EEOC charge and is therefore outside the scope of the charge. Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992). In her deposition testimony, however, Plaintiff stated that she was not denied the use of the telephone, but rather had to share it with co-workers. This is not sufficient to establish an adverse employment action.

At some point during her employment at the Uptown clinic, Plaintiff contends she put in a series of requests to transfer to different work sites or different public health programs. None of these requests were successful. A plaintiff cannot establish an adverse employment action by alleging, in conclusory fashion and without evidentiary support, that she suffered a loss of pay, career opportunity or any other benefits because she was not transferred to an unspecified job or location. See Traylor v. Brown, 295 F.3d 783, 789 (7th Cir. 2002). Plaintiff fails to provide sufficient evidence to demonstrate that she put in transfer requests for available jobs for which she was qualified.

Plaintiff alleges that she suffered an adverse employment action when she was moved out of the field room and into a small, single-occupant office with a desk, chair, file cabinet, and telephone that had previously served as a file storage closet. Although moving an employee's desk into a closet has been described as a "classic case" of adverse employment action, it is not clear that Plaintiff viewed the move as adverse. Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 744-45 (7th Cir. 2002). Plaintiff claims in her complaint that this was an adverse action, but provides no supporting evidence. Moreover, she admits in her deposition that she preferred the "closet" workspace to the field room at that time. Plaintiff has not produced enough evidence to establish that this move constituted an adverse employment action.

Finally, Plaintiff contends that the March 2002 City Inspector General's Office

-28-

investigation of a complaint that Plaintiff was carrying a dangerous weapon to work was an adverse employment action. Plaintiff asserts that the complaint which prompted the investigation was false and made in retaliation against her for calling the police to the work site and for filing a sexual harassment claim with the City. However, there is no evidence in the record to support Plaintiff's assertion or to indicate that the investigation was handled improperly. This Court does not make light of the embarrassment Plaintiff experienced from the investigation, but this is insufficient to establish an adverse employment action. There is likewise no evidence that the investigation resulted in any of the results required for an actionable adverse employment action. Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted).

### b.    Failure to Establish Similarly Situated Male Employee

As part of her prima facie case, Plaintiff must establish that she was treated differently from a similarly-situated male employee. The formulation for determining whether two employees are "similarly situated" depends upon the context of the case. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). "[I]n disciplinary cases – in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue, 219 F.3d at 617-18 (citations omitted). Plaintiff argues that she was treated differently from Fred Woods, who she contends was a similarly situated employee. This creates an unusual situation, in which Plaintiff appears to

be comparing herself to the person she describes as her primary harasser. Plaintiff has not offered any evidence to support finding Woods similarly situated to Plaintiff, however, beyond her conclusory statements. What the evidence does demonstrate is that Woods had a different position title and had been working at the Uptown clinic longer than Plaintiff, both of which cut against finding him a similarly-situated employee. Plaintiff has offered no evidence about Woods' performance, qualifications, or the standards to which he was subject. Plaintiff has therefore failed to identify a similarly-situated male employee.

Because Plaintiff fails to establish a prima facie case of sex discrimination, this Court need not continue the McDonnell-Douglas burden-shifting analysis. Summary judgment is appropriate for the Defendant on Plaintiff's sex discrimination count (Count III).

### C.    Plaintiff's Retaliation Claim

Title VII also prohibits employers from retaliating against employees who have "opposed any practice made unlawful by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. See 42 U.S.C. § 2000e-3(a). As with a sex discrimination claim, a plaintiff may attempt to establish retaliation through direct or indirect evidence.

Here, plaintiff has produced no direct evidence of retaliation. To make a prima facie case of retaliation under the indirect McDonnell Douglas approach, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she was performing her job according to employer's legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. See Luckie v. Ameritech Corp., 389 F.3d 708 (7th

-30-

Cir. 2004). She cannot prevail via the indirect method of burden-shifting under McDonnell Douglas because she has presented no evidence of a similarly-situated employee who did not engage in statutorily protected activity and was treated more favorably by the City. See Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640 (7th Cir. 2002). As with her sex discrimination count, Plaintiff's prima facie case for her retaliation count fails because Plaintiff is unable to establish an adverse employment action or to identify a similarly-situated male employee.

## IV.    Conclusion

For the foregoing reasons, the City's motion for summary judgment is granted in part and denied in part. Specifically, plaintiff's sexual harassment claim may proceed to trial, but summary judgment is granted as to her sex discrimination and retaliation claims.

**Enter:**

_____

**David H. Coar**
**United States District Judge**

**Dated:**        **December 17, 2004**